UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SINGULAR DTV, GmbH,**<br><br>       *Plaintiff,*<br><br>  v.<br><br>**JOHN DOE,**<br><br>       *Defendant.* | Civil Action No. 1:21-cv-06000-VEC |

**AFFIDAVIT OF CARL VOLZ, ESQ. IN SUPPORT OF PLAINTIFF'S COMPLAINT AND MOTION FOR LEAVE TO SERVE A THIRD-PARTY SUBPOENA PRIOR TO A <u>RULE 26(f) CONFERENCE</u>**

  **CARL VOLZ**, being duly sworn and deposed, states under threat of perjury:

  1.  I am an attorney duly admitted to practice in the State of Illinois.

  2.  Until May 2021, I served as General Counsel to Plaintiff, Singular DTV GmbH and its affiliates (together, "<u>SingularDTV</u>" or the "<u>Company</u>"). As such, I am fully familiar with the facts and circumstances set forth herein. I submit this Affidavit in support of Plaintiff's Complaint and Motion for Leave to Conduct Expedited Discovery Prior to a Rule 26(f) Conference.

  3.  SingularDTV is a company that uses blockchain technology to create a decentralized ecosystem for the entertainment and film industries. SingularDTV also used blockchain technology to form the SNGLS cryptocurrency tokens ("<u>SNGLS</u>" or the "<u>Tokens</u>").

  4.  SingularDTV GmbH has three shareholders: Joseph Lubin ("<u>Lubin</u>"), Arie Levy-Cohen ("<u>Levy-Cohen</u>") and Zach LeBeau ("<u>LeBeau</u>").

  5.  At the time of the events described herein, LeBeau served as the Company's Chief Executive Officer.

  6.  On or about February 17, 2020, Lubin and LeBeau proposed on behalf of the Company

a settlement to Levy-Cohen (the "Settlement Agreement") pursuant to which he would relinquish all of his ownership interest in SingularDTV and formally resign from all positions with respect to the Company.

7. Levy-Cohen initially ignored the offer, which was rescinded by the Company on or about February 28, 2020.

8. In early 2021, I recommended to LeBeau and Lubin that we approach Levy-Cohen again with the proposal to purchase his interests. Around the same time, I heard from an associate of Levy-Cohen that Levy-Cohen was agreeable to the terms of the Settlement Agreement and willing to execute the Settlement Agreement.

9. In or about February 2021, I spoke with Levy-Cohen by telephone. On that call, he expressed to me his interest in proceeding with a settlement and relinquishing all his ownership interest in the Company.

10. Following that phone call, I communicated with Levy-Cohen solely by e-mail; all such communications were through the Company e-mail platform using a Company issued laptop computer.

11. In those communications, I urged Levy-Cohen to sign the Settlement Agreement. Levy-Cohen did not immediately sign the agreement instead made excuses for ongoing delays.

11. In early March 2021, an unknown third party, the Defendant, appears to have hacked my Company computer and e-mail in order to set up an Microsoft Outlook rule directing communications from an e-mail address I knew to belong to Levy-Cohen to an 'RSS' folder that I never checked. Those e-mails were effectively buried in a subfolder without my knowledge or consent.

12. At or around the same time, Defendant began to impersonate Levy-Cohen in e-mail correspondences using an e-mail account which closely mimicked Levy-Cohen's known e-mail address (the "Fraudulent Account").[1] I did not learn of the hack or the Fraudulent Account until May

---

[1] Levy-Cohen's real e-mail address is arielevycohen@gmail.com. The Fraudulent Account e-mail address is arielevyycohen@gmail.com.

7, 2021.

13. The Defendant used the same phrases and figures of speech which Levy-Cohen used regularly when he worked with the Company and which he continued to use in confirmed e-mail communications, as well as on Levy-Cohen's own social media accounts. Moreover, the Defendant referenced events and relationships which I believed only Mr. Levy-Cohen would have been privy to.

14. The Defendant, pretending to be Levy-Cohen, continued to delay execution of the Settlement Agreement, referencing how busy he was with work and homeschooling his child. The foregoing reinforced my belief that I was communicating with Levy-Cohen.

15. Then, on May 4, 2021, I received an e-mail from the Fraudulent Account, which I believed to be Levy-Cohen, asking how quickly the settlement transactions could be finalized. I had no reason to suspect that this request did not come from Levy-Cohen.

16. I responded that the settlement agreement was ready to be signed and that the consideration payable thereunder (cryptocurrency) could be transferred very quickly. In reply, I received an e-mail requesting that I send an updated execution copy of the settlement agreement, which I promptly did. A true and correct copy of the e-mail correspondence is annexed hereto as **Exhibit "CV-A"**.

17. I received the signed Settlement Agreement and accompanying transaction documents early on May 6, 2021. I reviewed the signatures against Company documents containing Levy-Cohen's known signature. The signatures appeared to be an exact match.[2] *See* **Exhibit CV-A** (e-mail from the Fraudulent Account to Volz dated May 6, 2021, containing the executed transaction documents).

18. Upon receipt of the signed Settlement Agreement and confirmation that the signature was a match, I advised Mr. LeBeau that the Settlement Agreement had been executed by Levy-Cohen

---

[2] In fact, Mr. Levy-Cohen himself confirmed in a phone call on May 7, 2021, that the signatures appeared to be his – though he could not say how the third party might have obtained a copy of his signature.

and asked him to transfer 76,800,000 SNGLS tokens and 11,520,000 SNGJ tokens (the "SNGJ Tokens") to the wallet addresses provided in the e-mail accompanying the executed Settlement Agreement (the "Recipient Wallet Addresses").

19. On May 6, 2021, Mr. LeBeau sent the cryptocurrency to the Recipient Wallet Addresses and informed me of the completed transfer. After the SNGLS Tokens were transferred to the Recipient Wallet Addresses provided by the Fraudulent Account, I learned that they were then transferred to three separate wallet addresses. The SNGLS Tokens were then transferred to Binance. A true and correct copy of the Token transaction history taken from etherscan.io is annexed hereto as **Exhibit "CV-B"**.[3]

20. The following day, I was informed that the proffered cryptocurrency wallets did not belong to Mr. Levy-Cohen, and that my e-mail account had been hacked.

21. The Company's IT consultant, DAG Tech, LLC, conducted an internal investigation, then located and reversed the rule change implanted by Defendant.

22. I subsequently filed a complaint on behalf of the Company with the Internet Crime Complaint Center of the Federal Bureau of Investigation. The complaint recounted the unauthorized intrusion into Company computer systems and my interactions with the Fraudulent Account. A true and correct copy of the Complaint Referral Form is annexed hereto as **Exhibit "CV-C"**.

Dated: Chicago, Illinois
July 13, 2021

By: Carl Volz, Esq.

Sworn to me before this
13th day of July 2021

NOTARY PUBLIC

OFFICIAL SEAL
Cheryl L. Ziegler
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires May. 3, 2023

---

[3] Exhibit CV-B identifies the Original Recipient Wallet Addresses and depicts the subsequent transfers of the misappropriated cryptocurrency to secondary wallet addresses and ultimately to Binance, where no further transaction history is available. Etherscan.io is a blockchain analytics platform for Ethereum.