UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------x

SINGULARDTV, GMBH,                                    Case No. 1:21-cv-10130

           Plaintiff,

           -against-

ZACHARY LEBEAU and KIMBERLY JACKSON,

           Defendants.

-----------------------------------------

### DECLARATION OF NIKLAUS GLATTHARD IN OPPOSITION TO PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER and PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, I, **NIKLAUS GLATTHARD**, states as follows:

1.     I am a partner at Advokatur & Notariat Glatthard, Zurich, Switzerland ("ANG"). ANG, acting through me, advises and represents Mr. Zachary James LeBeau ("LeBeau") in corporate, notarial and dispute resolution matters. A true and correct copy of our power of attorney is attached as Exhibit 1. ANG has advised and represented LeBeau since August 2, 2021.

2.     I submit this Declaration in opposition to Plaintiff's request for a temporary restraining order and preliminary injunction in the above-captioned action.

3.     In preparing this Declaration, I have reviewed the following documents:

    (a)  Meeting minutes for the following meetings of the Board of Directors (the "Board") and the Shareholders of SingularDTV GmbH ("SingularDTV" or the "Company"):

        (i)     May 27, 2021 Board Meeting

        (ii)    June 8, 2021 Board Meeting

        (iii)   August 27, 2021 Board Meeting

        (iv)   September 24, 2021 Extraordinary Shareholder Meeting

    (b)  Notarial Deed of the Incorporation of SingularDTV incl. the Articles of Association of SingularDTV of October 28, 2016.

    (c)  Bylaws of SingularDTV of February 9, 2018 (the "Bylaws")

    (d)  The settlement agreement executed between SingularDTV and purportedly Mr. Arie Levy-Cohen ("Levy-Cohen") on May 6, 2021

(e) A resignation letter dated February 12, 2019, purportedly signed by Levy-Cohen (the "Resignation Letter")

4. Based on the documents I have reviewed, Levy-Cohen, then Chairman of the Board of SingularDTV, signed and delivered the Resignation Letter. To the best of my information, Levy-Cohen signed the Resignation Letter in the presence of Mr. Martin Trepp ("Trepp"), the interim CFO of SingularDTV. A true and correct copy of the Resignation Letter is attached as Exhibit 2.

5. Under Swiss law, a resignation of a board member of a GmbH is possible at any time, where, as in the case of SingularDTV (cf. Article 12 of the Articles of Association), the board members are elected by the shareholders' meeting (cf. BSK OR II-Watter, Art. 815 N 8). The resignation of the board member becomes effective as an unconditional declaration, which is subject to the rights of third parties acting in good faith, upon receipt by the Chairman or, if applicable, by the Vice-Chairman. To the best of my information, knowledge and belief, the Resignation Letter was delivered by Trepp to all other Board members, Mr. Patrick Allenspach (the Resident Director of the Company in Switzerland; "Allenspach"), Mr. Joseph Michael Lubin ("Lubin") and LeBeau. Levy-Cohen's resignation took effect at the time the Resignation Letter was received by the other Board members.

6. To the best of my information, knowledge and belief, Levy-Cohen did not attend another meeting of the Shareholders or the Board of SingularDTV – nor did he participate in the business of the Company – from the date of the Resignation Letter until May 2021 when he, together with Lubin, sought to gain control over the Company.

7. To the best of my information, knowledge and belief, Levy-Cohen has not been re-elected to the Board, following his resignation.

8. Following Levy-Cohen's resignations as CFO (in or around April 2018) and Board member, Lubin and LeBeau submitted a proposal to Levy-Cohen in the spring of 2019 for his departure from SingularDTV. Because of the continued negotiations with Levy-Cohen for his exit as a shareholder (subsequent to his resignation from the Board on or around February 12, 2021), I understand that the Swiss Commercial Register for the Canton of Zug (the "Zug Commercial Register") was not updated to reflect Levy-Cohen's resignation, which had become effective upon receipt by all the other Board members.

9. However, under Swiss law, the registration of a board member in the commercial register is declaratory in nature. However, third parties acting in good faith can only be held against the elected person's position on the board if his/her role is registered and published in the commercial register (cf. BSK OR II-Wernli/Rizzi, Art. 710 N 7 et seq.). In other words, Levy-Cohen's resignation had taken effect, but a third party acting in good faith could have maintained that Levy-Cohen continued to be a member of the Board.

10.   After extensive efforts, Levy-Cohen purportedly communicated his interest in agreeing to the settlement agreement on March 11, 2021. On May 6, 2021, SingularDTV's then-chief counsel, Carl Volz ("Volz"), received an email containing a PDF copy of the negotiated settlement agreement with Levy-Cohen's purported signature. Volz instructed LeBeau, as CEO of the Company, to make the payment to Levy-Cohen in accordance with the terms of the settlement agreement. To the best of my information, knowledge, and belief, LeBeau executed the transfers on behalf of SingularDTV to the designated cryptocurrency wallets as instructed by Volz on May 7, 2021. On the date of the transfer, the value of the SNGLS tokens was approximately $2,000,000.[1] A true and correct copy of the settlement agreement executed on May 6, 2021 is attached as Exhibit 3.

11.   I was informed that that same day, Levy-Cohen informed Allenspach that he had not in fact signed the settlement agreement. It was then deduced that Volz's computer was hacked and that the Company appeared to have been the victim of a cleverly executed fraud.

12.   Levy-Cohen's signature on the settlement agreement is indistinguishable from his actual signature. To the best of my information, knowledge and belief, it is undetermined at this time whether Levy-Cohen was involved in the hacking incident.

13.   On or around May 27, 2021 the Company purported to hold a board meeting for the purpose of terminating LeBeau as the CEO as a result of the hacking incident.

14.   Since Levy-Cohen had resigned from the Board and was never re-elected to that position, Levy-Cohen could not validly convene a meeting of the Board. For the same reason, the Board meeting of June 8, 2021, terminating Mrs. Kim Jackson's ("Jackson") role and the services of the SingularDTV LLC, the US affiliate, and the meeting of August 27, 2021, removing Jackson as COO of the Company and convening an extraordinary shareholders' meeting, among others, were not validly constituted in accordance with Swiss law and para. 14 et seq. of the Company's Bylaws which requires that "*a board meeting is validly constituted, if at least 50% of the Managing Directors are present (including by video or telephone conference*". The Board did not have the required quorum at these meetings and the decisions taken are null and void. A true and correct copy of the Bylaws is attached as Exhibit 4.

15.   Under Swiss law, a shareholder in a GmbH may bring an action to withdraw from the company for good cause (Article 822 para. 1 of the Swiss Code of Obligations; "CO"). The right to withdraw from the company is a mandatory and thus inalienable right of each shareholder, which may not be restricted by the articles of association. Accordingly, when assessing the action for withdrawal from the

---

[1] To the best of my information, the value of the SNGLS tokens notably appreciated in the days leading up to the Levy-Cohen redemption due to unusual activity which included Chinese pumpers used to impersonate the Company thereby inflating the value of the tokens. As can be seen on the chart, attached as Exhibit 5, between December 2018 and April of 2021, the price of SNGLS tokens was steadily in the price range of $0.01 - $0.003. In April/May of 2021, the SNGLS price was at an anomalous high. By the end of May of 2021, it had resumed to its usual price of below $0.001.

company, the judge is not obliged to weigh the interests of the plaintiff in withdrawing from the company against the interests of the company in keeping the shareholder in the company. If there is good cause, the shareholder has the right to withdraw from the company, namely even if the company's substance is weakened by the withdrawal (cf. Handschin Lukas/Truniger Christof, Die GmbH, 3rd ed., Zurich - Basel - Geneva 2019, p. 248 et seq.).

16.     Swiss law does not explicitly state how to proceed with the ordinary shares of the withdrawing shareholder. However, Article 825a para. 1 CO contains rules on the due date of the compensation, from which it can be concluded that these ordinary shares (i) can be taken over by the company (Article 825a para. 1 no. 1 CO); (ii) can be sold by the company (Article 825a para. 1 no. 2 CO) or (iii) can be cancelled by means of a capital reduction (Article 825a para. 1 no. 3 CO). In the present case, none of these three possibilities can apply: Firstly, SingularDTV's share capital amounts to CHF 20,000, i.e. the statutory minimum capital of a GmbH. A reduction is excluded. Secondly, I learned that the ordinary shares of LeBeau cannot be sold (at least not at present). The Articles of Association and/or the Bylaws also provide for no basis for a forced transfer to the co-shareholders. Thirdly, LeBeau's shares (43% of the shares in SingularDTV) would therefore fall to the Company in the event of his withdrawal. However, if a company acquires its own ordinary shares, the total nominal value of these ordinary shares may not exceed 35% of the share capital (Article 783 para. 1 in conjunction with para. 2 CO). In summary, an action to withdraw was not an option for LeBeau.

17.     This does not deprive the shareholder who wishes to withdraw of all means of action. In partic-ular, Article 821 para. 3 CO grants him the right to bring an action before the court against the company for dissolution of the company for good cause. When examining the existence of "good cause" within the meaning of this provision, it will have to be taken into account that a withdrawal - which would generally have priority over the dissolution of the company ("subsidiarity of the action for dissolution") - is excluded due to the acquisition cap of Article 783 para. 2 CO. Instead of dissolution, the court may also decide on another appropriate solution that is reasonable for the parties involved (Article 821 para. 3 CO), but always in compliance with the limits of Article 783 CO.

18.     Both an action to withdraw as well as an action for dissolution require good cause. Under Swiss law, good cause generally exists if the essential conditions of a personal and factual nature under which the articles of association were entered into no longer exist, so that the achievement of the company's purpose is rendered impossible, significantly impeded or endangered and the shareholder can no longer be expected to continue the company. The assumption of good cause is thus a matter of judgment and must be examined on the basis of the individual, concrete circumstances of the GmbH concerned (cf. BSK OR II-Stäubli, Art. 821 N 17-21). Dissolution can be demanded for any good cause; these can lie in the circumstances of the company itself, but also in the relationship between the shareholders or between the shareholders concerned and the GmbH.

19.     According to Article 812 CO, a director of a GmbH is subject to a strict duty of loyalty. In his decisions and actions, he is bound exclusively to the interests of the company and must exercise his duties with all due care. He is liable for any negligence. The decisive factor is how a reasonable managing director would have acted under the same circumstances, i.e. with the information that was or should have been available at the time of the breach of duty. When examining whether the managing director acted diligently, each transaction must be assessed individually. Stricter standards are to be applied if the managing director does not act in the interest of the company, but in his own interest, in the interest of shareholders or in the interest of third parties (cf. Handschin Lukas/Truniger Christof, Die GmbH, 3rd ed., Zurich - Basel - Geneva 2019, p. 307 et seq.).

20.     To the best of my information, knowledge and belief, LeBeau realized Lubin und Levy-Cohen undertook everything - although disputed - to have him removed from his positions and thereby creating the impressions in the exhibits required to have LeBeau deregistered in the Zug Commercial Register. Furthermore, Lubin and Levy-Cohen were continuously subject to conflicts of interest vis-à-vis the Company and have repeatedly breached their duty of care and loyalty as directors of the Company since the Company's incorporation. As the confidence in his co-shareholders, Lubin and Levy-Cohen, had completely broken down, to remain as a shareholder in the Company became intolerable for LeBeau.

21.     Against this background, LeBeau filed a conciliation request relating to an action for dissolution of the GmbH with the Justice of Peace Office in Zug, Switzerland on 24 September 2021, including evidence of Lubin's and Levy-Cohen's conflicts of interest and breaches of their duty of care and loyalty. I understand that LeBeau stands by all his statements in the action of September 24, 2021, which were made based on the - although disputed - factual situation created by Levy-Cohen and Lubin in their - null and void - resolutions of the Board as well as the shareholder meeting. A copy of LeBeau's September 24, 2021 filing (translated into English) was submitted as Exhibit 8 to the Declaration of Mr. Michael Mráz of November 26, 2021.

22.     At the hearing of December 2, 2021 before the Justice of Peace Office, the parties were not able to reach a settlement. Lubin, Levy-Cohen and Allenspach, through their attorney in Switzerland, Michael Mráz, requested on behalf of SingularDTV, that LeBeau's claims shall be dismissed and contested the facts as described in the conciliation request in their entirety. In the same procedure, Mr. Mráz, filed a statement and counterclaim on behalf of SingularDTV, requesting, among other things, that Ether shall be transferred into another wallet and that LeBeau shall pay damages for the depreciation in value of the Ether between June 2, 2021, and the date of the judgement incl. interest as well as damages in the amount of no less than CHF 2,000,000 to the Company. A true and correct copy of the statement and counterclaim of December 2, 2021 is attached as Exhibit 6.

23.     The Justice of Peace Office subsequently issued an order authorizing LeBeau to proceed with the action to the court of first instance within three months from the issuance of the authorization. I have

received the authorization today. <u>A true and correct copy of the authorization to proceed of December 6, 2021 is attached as Exhibit 7.</u>

24.     Following the filing of the action for dissolution with the court of first instance within the afore-mentioned deadline and the payment of the advance on court costs, Lubin, Levy-Cohen and Allenspach, on behalf of SingularDTV, will be offered the opportunity to respond in detail to the assertions in the action for dissolution and submit their detailed counterclaim again.

* * * * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in December 7, 2021,
in the City of Zurich, Switzerland

NIKLAUS GLATTHARD
Advokatur & Notariat Glatthard
Limmatquai 80
8001 Zürich, Switzerland
+41 33 828 31 31
niklaus.glatthard@glatthard-law.ch

**VOLLMACHT**

**Zachary James LeBeau**, 345 West 57th Street, #175 New York, NY 10019, USA

hereinafter Principal, hereby authorizes by granting the right of substitution

**Attorney and Notary Public Dr. Melchior Glatthard**; and
**Attorney Niklaus Glatthard**

hereinafter Attorneys or Representatives with mailing address as per their law firm

**Advokatur & Notariat Glatthard, Limmatquai 80, CH-8001 Zürich**

with representation rights in the matters of **SingularDTV GmbH**.

The Attorneys are hereby authorized to represent the Principal in this matter and to carry out all the requisite legal actions in his/her name in their capacity as holders of an unlimited power of attorney. In particular, they are individually authorized to initiate legal proceedings, to recognize or withdraw claims, to initiate and execute debt enforcement proceedings, to file bankruptcy applications, to receive payments, securities and objects of litigation and to sign receipts therefor with legal effect, to conclude an agreement on jurisdiction or an arbitration agreement, to conclude a settlement or a waiver or to justify the waiver, to conclude contracts, to act as representation in inheritance matters and in the event of public notarizations and registry of deeds transactions, and moreover to undertake everything that requires a special power of attorney by law. The Attorneys shall safeguard the interests of the Principal properly and fairly and shall conscientiously manage those matters with which they have been entrusted; moreover they shall comply with their duties of loyalty and confidentiality.

The Principal shall pay the fees and the expenses of the Attorneys. The fee is calculated in accordance with the fee agreement concluded with the Principal or, in the absence of which, pursuant to the applicable cantonal fee ordinance for attorneys. The Principal shall pay the Attorneys an appropriate advance payment upon request and to increase this if necessary. In order to secure its claims the law firm has a lien on the Principal's anticipated entitlements, receivables and other rights. In order to be able to assert any claims arising from this contractual relationship, the Representatives are released from their duty to maintain professional secrecy. The Principal hereby agrees to communication by e-mail.

**The ordinary courts at the location of the registered offices of the law firm are recognized as competent for any disputes that arise between the Principal and the Attorneys or the law firm, insofar as the law does not stipulate any other mandatory jurisdiction. Swiss substantive law shall apply. Subject to the provisions governing the competence of the legal supervisory body.**

This power of attorney can be revoked at any time. Subject to provisions of procedural law to the contrary, this power of attorney does not lapse in the case of the death, the official declaration of being missing, the loss of the capacity to act or the bankruptcy of the Principal. A copy of this power of attorney is available for the Principal.

New York, USA    September 24, 2021

**Place, Date**                                                        **Zachary James LeBeau**

SingularDTV GmbH

Gartenstrasse 6

6300 Zug

Zug, 12 February 2019

**Resignation as Director of SingularDTV GmbH, Zug**

Dear colleagues

I hereby declare my resignation as director of SingularDTV GmbH, Zug, with immediate effect. I would like to take this opportunity to thank you all for the always productive collaboration and wish you all the very best for your professional and personal future.

Sincerely

Arie Levy-Cohen



## SETTLEMENT AGREEEMENT
## and
## MUTUAL RELEASE

This Settlement Agreement and Mutual Release ("Agreement") is entered into between Arie Levy-Cohen ("Levy-Cohen") and SingularDTV GmbH (the "Company" and, together with Levy-Cohen, the "Parties");

WHEREAS Levy-Cohen was one of the founders of the Company, served as the Company's Resident Director until May 6, 2021 and remains a shareholder and member of the Company's Board of Directors; and

WHEREAS Levy-Cohen has left his post as Resident Director effective as of May 6, 2021; and

WHEREAS Levy-Cohen has been apprised of the current financial condition of the Company and advised of the Company's plans for the foreseeable future, including but not limited to plans which have the potential to substantially increase the Company's value; and

WHEREAS the Parties wish to effect Levy-Cohen's resignation from the Company's Board of Directors and the surrender of Levy-Cohen's shares in the Company;

NOW THEREFORE, for good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.      **Recitals.**  The foregoing Recitals are expressly incorporated as part of this Agreement, and the Parties confirm and represent to one another that said Recitals are true and correct to the best of their knowledge, information and belief.

2.      **No Admission of Liability.**  It is expressly understood that this Agreement and the settlement it represents are entered into solely for the purpose of allowing the Parties to avoid further disagreement and potential litigation. This Agreement does not constitute an admission by either Party of any wrongdoing, contractual obligation or any duty whatsoever, whether based in statute, regulation, common law, or otherwise, and each Party expressly denies that any liability or any such violation has occurred.

3.      **Terms of Settlement.**  In exchange for Levy-Cohen's resignation from the Company's Board of Directors, his surrender of his Company stock and his agreement to forever relinquish any right to or interest in the Company, any revenue the Company may earn in the future, and any proceeds that may arise from the Company's dissolution or sale, or from any equity or liquidity event involving the Company (excluding payments specifically described in this paragraph), the Company hereby agrees  to immediately undertake the following actions for the benefit of Levy-Cohen: (a) forgiveness of any and all debts owed to the Company by Codex Execution GmbH, a Swiss limited liability company in which Levy-Cohen owns a majority interest; (b) delivery of approximately 76,800,000 SNGLS tokens being held by the Company for the benefit of Levy-Cohen; (c) delivery of any other tokens or other digital currencies being held by the Company in the name of and/or for the benefit of Levy-Cohen; and (d) execution of the mutual releases set forth herein. Further if, before the end of calendar year (2023), the Company sells or otherwise monetizes the 765,096 shares it holds in Centrality, a New Zealand Limited Company, it shall promptly pay to Levy-Cohen an amount equal to ten percent (10%) of the gross proceeds of such sale(s) or monetization(s).

**4.     Tax Consequences.**  The Parties make no representations regarding any potential tax consequences arising from this Agreement.  Each Party agrees that it will not assert a claim against the other Party for the payment of any taxes resulting from the provision of any consideration or forgiveness of any debt effected pursuant to this Settlement Agreement.

**5.     Termination of all Previous Offers and Agreements.**  The Parties hereby agree that, effective as the execution of this Agreement, any prior agreements or understandings which may have existed between the Parties, whether oral or written and of whatever nature, will terminate in all respects and be of no further force or effect.

**6.     Certain Acknowledgements.**  The Parties hereby acknowledge and agree that, except as expressly set forth herein or as required by law, Levy-Cohen will not be entitled to make a claim for any other compensation or benefits from the Company and, further, that Levy-Cohen hereby agrees that, except as expressly set forth herein or as required by law, he will have no further interest, rights or benefits in respect of his employment by or ownership of the Company.

        **a.     General Release.**

            **i.     Release of Claims.**  The Parties, on behalf of themselves and their families, agents, representatives, heirs, executors, trustees, administrators, attorneys, successors and assigns, predecessors, stockholders, partners, members, directors, managers, officers, employees, agents or other representatives, hereby irrevocably and unconditionally release, settle, cancel, acquit and discharge, waive any and all rights that he, she, it or they may have against, and covenant not to sue each other with regard to any and all claims, contractual or otherwise, demands, costs, rights, causes of action, charges, debts, liens, promises, obligations, complaints, losses, damages and all liability of whatever kind and nature, whether known or unknown from the beginning of time up to and including the time of signing this Agreement, or that otherwise may exist or may arise in respect of the Parties' relationship to each other; provided, that such released claims shall not include any claims to enforce the Parties' rights under this Agreement.  Thus, for the purpose of implementing a full and complete release and discharge of the Parties' rights and obligations, the Parties expressly acknowledge that this Agreement is intended to include in its effect, without limitation, all released claims that the Parties do not know or suspect to exist in their favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any released claims.

            **ii.     Covenant Not to Sue; Certain Proceedings.**  The Parties agree not to bring any action, suit or proceeding whatsoever (including the initiation of governmental proceedings or investigations of any type) against each other for any matter or circumstance covered under the foregoing paragraph.  Further, the Parties agree not to encourage or suggest to any other person or entity that he, she or it institute any legal action against the other Party.  Notwithstanding the foregoing, this release is not intended to interfere with a Party's right to file a charge with the Equal Employment Opportunity Commission (EEOC) in connection with any claim.

            **iii.     Extent of Release.**  This release is valid whether any claim arises under any federal, state or local statute or regulation (including, without limitation, Title VII of the

Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, as amended by the Older Workers Benefits Protection Act of 1990, the Equal Pay Act, the Americans with Disabilities Act of 1990, the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the Family and Medical Leave Act, the New York State Constitution, the New York Human Rights Law (Executive Law §§ 290 et seq.), the New York City Human Rights Law (N.Y. City Administrative Code §8-101 et seq.), New York Labor Law §§740, et seq. as amended, the Hawaii Constitution, Hawaii Employment Practices Law; Hawaii Wage and Hour Law; Hawaii Wages and Other Compensation Law, the laws of Puerto Rico, the California Constitution, the California Fair Employment and Housing Act, the California Minimum Wage Law; the Equal Pay Law for California, California Family Rights Act, the California Labor Code (except the provisions relating to workers' compensation and as further described below), the California Business & Professions Code §§ 17200, et seq, and all other federal, state, city or local statutes regulating the terms and conditions of employment), regulation or ordinance, under the common law or in equity (including any claims in tort or under contract for wrongful discharge or otherwise), or under any policy, agreement, understanding or promise, written or oral, formal or informal, between the Parties. Levy-Cohen acknowledges and agrees that he has received all salary, wages, bonuses, or other such sums due to him other than amounts to be paid pursuant to this Agreement. In light of the payment by the Company of all wages due, the Parties further acknowledge and agree that California Labor Code Section 206.5 is not applicable to the Parties. The Parties also understand and agree that this Agreement extends to all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, past or present, and all rights under Section 1542 of the California Civil Code are hereby expressly waived. Section 1542 of the California Civil Code reads as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR". Thus, notwithstanding the provisions of section 1542, and for the purpose of implementing a full and complete release and discharge of the Releasees, the Parties expressly acknowledge that this Agreement is intended to include in its effect, without limitation, all released claims that the Parties do not know or suspect to exist in their favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any released claims. Notwithstanding any provision of this Agreement, Levy-Cohen is not releasing the Company from any obligation it may have to him in the future under California Labor Code Section 2802 to the extent provided therein.

      **iv.**    **Claims that Cannot be Waived.** However, this general release excludes, and Levy-Cohen does not waive, release, or discharge (A) claims that cannot be waived by law, such as claims for workers' compensation or unemployment benefits; (B) indemnification rights Levy-Cohen may have against the Company; and (C) any right to file an unfair labor practice charge under the National Labor Relations Act.

    **b.**    **Restrictive Covenants.**

      **i.**    **Confidentiality.** Levy-Cohen acknowledges and agrees that at all times, without the prior written consent of the Company and except as required in performance of his duties hereunder, he shall not use or disclose any confidential or proprietary trade secrets, customer lists, drawings, designs, marketing plans, management organization information

(including, but not limited to, data and other information relating to members of the boards of directors of the Company or to the management of the Company), operating policies or manuals, business plans, financial records, or other financial, commercial, business or technical information relating to the Company (collectively, "Confidential Information") to any third Person (as defined below) unless such Confidential Information has been previously disclosed to the public generally, is in the public domain, or has been rightfully received by Levy-Cohen from a third party who is authorized to make such disclosure, in each case, other than by reason of Levy-Cohen's breach of this paragraph, or the disclosure of which Levy-Cohen may be required by law; *provided*, *however*, Levy-Cohen will provide the Company with prompt notice of any requirement or proceeding which would compel him to disclose the Confidential Information (including, without limitation, a judicial or administrative proceeding or by interrogatories, civil investigative demand, subpoena or other legal process) so that the Company may seek an appropriate protective order or other appropriate remedy, and Levy-Cohen will cooperate (at the Company's sole expense) with the Company's efforts in connection therewith. For purposes of this Agreement, "Person" shall mean any natural person, partnership, limited liability company, association, corporation, company, trust, business trust, governmental authority or other entity. Nothing in this Agreement prohibits or restricts Levy-Cohen (or his attorney) from initiating communications directly with, responding to an inquiry from, or providing testimony before any federal or state regulatory authority regarding this Agreement or the operations of the Company.

    **ii.**  **Non-Solicitation of Employees.** Beginning on the date hereof and ending the 6-month anniversary of the date hereof (the "Restricted Solicitation Period"), Levy-Cohen shall not, directly or indirectly, for himself or on behalf of or in conjunction with any other person, (A) attempt to hire any person that is an employee of the Company or was within six (6) months prior to the execution of this Agreement; provided, however, that the foregoing shall not be breached by a solicitation to the general public or through general advertising; or (B) solicit, advise or encourage any person, firm, government agency or corporation to withdraw, curtail or cancel its business with the Company.

    **iii.**  **Non-Disparagement.** The Parties mutually acknowledge and agree that neither Party shall directly or indirectly engage in any conduct or make any statement disparaging or criticizing in any way of the other Party including, in the case of the Company, its employees or personnel, or directly or indirectly engage in any other conduct or make any other statement that could be reasonably expected to impair the goodwill or reputation of the other party, except to the extent required by law, and then only after consultation with the other party to the extent possible, or to enforce the terms of this Agreement. However, these non-disparagement obligations do not limit either Party's ability to truthfully communicate with the EEOC, the National Labor Relations Board (NLRB), the SEC and comparable state and local agencies whether such communication is initiated by the Party or in response to the government.

    **iv.**  **Return of Documents.** Levy-Cohen acknowledges and agrees that he shall deliver to the Company all property of the Company in his possession, including but not limited to all Company documents and data of any nature, in whatever medium.

    **v.**  **Remedies.** The Parties acknowledge and agree that the covenants, obligations and agreements contained in this paragraph relate to special, unique and extraordinary

matters and that a violation of any of the terms of such covenants, obligations or agreements will cause the other Party irreparable injury for which adequate remedies are not available at law. Therefore, the Parties agree that in the event of a breach of the foregoing covenants, obligations or agreements, the other Party shall be entitled to an injunction, restraining order or such other equitable relief (without the requirement to post bond) to restrain the other Party from committing any violation of such covenants, obligations or agreements. These injunctive remedies are cumulative and in addition to any other rights and remedies the Parties may have.

7. **Confidentiality of this Agreement; No Admission.** The Parties will keep confidential and will not release or divulge, either orally or in writing to any person, except as may be required by law or regulation or by order of any court, this Agreement or any provision hereof or any information with respect thereto; *provided*, that nothing contained herein will prohibit the Parties from disclosing the terms of this Agreement to their spouse, attorneys, accountants, financial advisors or members of their immediate family. Nothing in this Agreement or any other policy or agreement between the Parties restricts or impedes the exercise of protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. This Agreement does not constitute an admission by the Parties or the Releasees of any violation of any contract or law, and the Parties and the Releasees expressly deny any such liability. This Agreement may not be introduced in any action or proceeding by anyone for any purpose except to evidence or enforce its terms.

8. **Consideration; Legal Advice, Reliance.** The consideration provided hereunder by the Parties is not required under the Company's standard policies and there are no other circumstances other than the Parties' assent to the terms of this Agreement that would require the Parties to provide such consideration. The Parties represent and acknowledge that (a) they have been given adequate time to consider this Agreement and have been given the opportunity to discuss all aspects of this Agreement with their private attorney; (b) they have carefully read and fully understand all the provisions of this Agreement; (c) they voluntarily entered into this Agreement, without duress or coercion; and (d) they have not heretofore assigned or transferred or purported to assign or transfer, to any person or entity, any of the claims described in this Agreement or any portion thereof or any interest therein.

9. **General Provisions.**

    a. **Cooperation.** The Parties agree to timely execute and deliver, or cause to be timely executed or delivered, such additional or further transfers, assignments, resolutions, endorsements, powers of attorney or other instruments or documents as may reasonably be requested by the other for the purpose of carrying out the intentions of the Parties hereto. Any reasonable out-of-pocket expenses associated with preparing or obtaining the requested material shall be borne by the requesting Party. Each Party agrees to cooperate with the other in effecting the transactions contemplated hereunder.

    b. **Third Party Beneficiaries.** All Releasees under this Agreement who are not signatories to this Agreement shall be deemed to be third party beneficiaries of this Agreement to the same extent as if they were signatories hereto.

        **c.**     **Withholding.**  The Company shall withhold from any amounts payable under this Agreement such federal, state and local taxes as may be required or permitted to be withheld pursuant to any applicable law or regulation.

        **d.**     **Entire Agreement.**  This Agreement constitutes the sole and complete understanding of the Parties with respect to the subject matter hereof. The Parties represent to each other that in executing this Agreement, they do not rely and have not relied upon any representation or statement not set forth herein made by any other person with regard to the subject matter, basis or effect of this Agreement.

        **e.**     **Amendment; Waiver; Successors.**  No amendment, modification or alteration of the terms and provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the Parties. No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provision hereof. No delay on the part of any Party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof. This Agreement shall be binding upon the parties hereto and their respective successors, trustees, administrators, transferees and assigns.

        **f.**     **Governing Law; Severability; Blue Pencil.**  This Agreement will be governed by the laws of New Jersey, without regard to its conflict of laws rules. In the event that any one or more of the provisions of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby. The Parties agree that the covenants contained in paragraph 6 are reasonable covenants under the circumstances, and further agree that if, in the opinion of any court of competent jurisdiction such covenants are not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions and enforce the remainder of such covenants as so amended.

        **g.**     **Counterparts.**  This Agreement may be executed in counterparts, each of which shall for all purposes be deemed to be an original, and all of which shall constitute the same instrument. The Parties hereto agree to accept a signed facsimile (or "PDF") copy of this Agreement as a fully binding original.

*    *    *    *

**IN WITNESS WHEREOF**, the Parties have hereto set their hand as of the date and year first indicated above.

**AGREED TO AND ACCEPTED BY:**


**SingularDTV GmbH**                                    **Arie Levy-Cohen**


_____                    _____

By: Zach LeBeau
Chief Executive Officer
                                                              5/6/2021
                                                           _____
                                                           Date

_____

Date



# Annex A:

# Organisational By-Laws and Board Regulation

## SingularDTV GmbH
with registered seat in Zug, Switzerland

### Table of Contents

| | | |
|---|---|---|
| I. | Policy Revision Tracker | 2 |
| II. | General Matters | 2 |
| III. | Executive Bodies | 2 |
| IV | Board of Directors | 2 |
| | A. Organization | 2 |
| | B. Duties and Powers | 3 |
| | C. Meetings | 3 |
| | D. Quorum of Attendance | 4 |
| | E. Resolutions | 4 |
| | F. Circular Resolutions and Other Forms of Resolutions | 5 |
| | G. Minutes | 5 |
| | H. Information | 5 |
| | I. Remuneration | 6 |
| V. | Senior Management | 6 |
| | A. Composition | 6 |
| | B. Organization | 6 |
| | C. Meetings | 7 |
| | D. Functions | 7 |
| | E. Reporting | 7 |
| VI. | Signing and Signing Authority | 7 |
| VII. | Governance | 7 |
| | A. General Principles on Asset Management | 7 |
| | B. Governance on Business Partners and Parties | 8 |
| | C. Organizational Governance | 8 |
| | D. Financial Governance | 9 |
| | 1. Accounting | 9 |
| | 2. Financial Planning | 9 |
| | 3. Financial Control | 9 |
| VIII. | Business Principles | 10 |
| | 1. Arm's Length | 10 |
| | 2. Effective Place of Management | 10 |
| IX. | Legal Compliance | 10 |
| X. | Conflicts of Interest | 10 |
| XI. | Outside Activities | 11 |
| XII. | Nepotism | 11 |
| XIII. | Bribery and Improper Payments and Transactions | 12 |
| XIV. | Confidentiality and Privacy | 12 |
| XV. | General Provisions | 13 |
| XVI. | Miscellaneous | 13 |
| | A. Effectiveness | 13 |
| | B. Modifications and Amendments | 13 |

## I.    Policy Revision Tracker

| Version No. | Changes Made | Section / Chapter | Approved by (Name & Role) | Valid From |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

## II.    General Matters

1   The business of SingularDTV GmbH (the **"Company"**) shall be conducted in accordance with Swiss law, the articles of association of the Company (the **"Articles"**), these board regulations (the **"Regulations"**), the Compliance Handbook of the Company and any policies issued by the Board from time to time.

2   The Regulations have been adopted by the Board of Directors (the **"Board"**) in accordance with the Swiss Code of Obligations (**"CO"**) and Articles [15] and [19] of the Articles.

3   The purpose of these Regulations is to govern the organization of the Board, define the executive powers within the Company and to delegate part of the duties and powers of the Board to the senior management of the Company (the **"Senior Management"**).

## III.    Executive Bodies

4   The Company has the following executive bodies (**"Body"** or **"Bodies"**):

- the Board (consisting of all its Managing Directors jointly, appointed by the Shareholders and registered in the Commercial Register); (Managing Directors hereinafter also referred to as "**Board Member**" or "**Board Members**"); and

- the Senior Management.

## IV.    Board of Directors

## A.    Organization

5   The shareholders of the Company ("Shareholders") shall appoint the Board. By simple majority the Shareholders are free to appoint as many managing directors as they wish. Also by simple majority any Managing Director can be dismissed provided that to be dismissed managing director will be consulted prior to such dismissal. The Board shall determine its own organization. It shall constitute separate committees as the development and the particular needs of the Company may require (e.g. for risk controlling, risk management, compensation issues, financial controlling, governance, or special projects). In such case special regulations may be issued by the Board.

6   It shall appoint its chairman (the "**Chairman**") for [one (1) year] tenure and the chairman can be reappointed by a simple majority. The Chairman has all duties and competencies conferred to him by law, the Articles of Incorporation and these Regulations.

7   The Chairman shall be one of the Managing Directors and shall be nominated by the General Meeting of Shareholders.

8   The Board shall appoint a secretary, who needs not be a member of the Board nor a shareholder.

## B.   Duties and Powers

9   The Board has the following duties and powers which by law (Art. 810 para. 2 CO) may not be delegated:

  - to overall manage the Company and issue the necessary directives;

  - to determine the Company's organization;

  - to organize the accounting system, the financial control, as well as the financial planning systems (liquidity planning);

  - to exercise the supervision over the persons entrusted with the management, in particular with respect to compliance with the law and with the Articles, regulations and directives;

  - to prepare the business report, as well as the General Meeting of the shareholders, and to implement the latter's resolutions;

  - to inform the court in case of insolvency or over-indebtedness.

  - to resolve on any other matter, which is subject to board resolution pursuant to the Articles or mandatory law.

## C.   Meetings

10  Meetings of the Board shall be convened by the Chairman as often as the business of the Company requires and whenever a member, indicating the reasons therefore, requests, but at least four (4) times a year.

11  The notice of any board meeting shall be dispatched in writing by courier, mail, fax or e-mail not less than seven (7) days prior to the date of the meeting. Such advance notice may be reasonably shortened in case urgent matters require an earlier or immediate meeting, with the approval of the majority of all Board Members.

12  The notice shall specify the place, date and time of the meeting as well as the agenda and, if at all possible, the proposed wording of the resolutions. Together with the notice, the members shall be provided with all information reasonably necessary for them to prepare for the meeting and make an informed decision on the agenda item.

13  Meetings may be held by video or telephone conference, but shall to the maximum extent practically possible be held in Switzerland. However, in any case its strategic meetings and decisions will in principle take place in Switzerland. As a minimum, 1 of the agreed minimum 4 board meetings per year shall take place in Switzerland.

**D.     Quorum of Attendance**

14  A board meeting is validly constituted, if at least 50% if the Managing Directors are present (including by video or telephone conference).

15  No quorum requirement applies for meetings at which the Board confirms the execution of a capital increase and resolves on changes of the Articles in connection with a share capital increase resolved by the General Meeting of Shareholders.

16  The Chairman shall have the casting vote.

**F.     Resolutions**

17  Except as set forth below, Board resolutions are taken by the majority of the votes of the Managing Directors present. In the event of equality of votes cast, the Chairman shall have the casting vote.

18  In addition, any affirmative decision on any of the following resolutions (the "**Important Board Matters**") shall require the consent of **at least 50% if all appointed** Managing Directors:

- any acquisition of a business or any part thereof (be it a share or asset transaction);

- the sale, disposal or transfer of all or substantially all of the Company's Business and/or assets;

- the entering into any joint venture or partnership or any profit sharing agreement (other than routine arrangements wholly within the ordinary course of business);

- any investment, capital expenditure, sale of assets, incurrence of debt or any contractual obligation by the Company in excess of CHF 1 million (whether by a single transaction or a series of related transactions) unless such expenditure has been specifically provided for in the Budget and Business Plan previously approved by the Board;

- any agreement providing for obligations in excess of CHF 1 million (whether by a single transaction or a series of related transactions), save as specifically set forth in the Budget and Business Plan as previously approved by the Board;

- the appointment and removal of the Company's CEO and all other members of the Senior Management;

- the approval of the Budget and its Business Plan, and any change thereto;

- the listing of shares of the Company on any securities exchange or automated quotation system;

- any related party transactions and arrangements including variations thereof;

- any transactions or arrangements other than on arm's length terms and/or in the ordinary course of business;

- the approval and amendment of any token or share option plan and option and/or token or share grants to the Senior Management, employees, contractors (employees and contractors hereinafter jointly: "**Employees**") or any third party;

- any proposed material change in accounting policies or principles save with the prior approval of the Company's auditors;

- any purchase by the Company of any of its own shares;

- any transfer of shares other than in accordance with the Shareholders Agreement; and

- any amendment or modification of these Regulations.

**F.     Circular Resolutions and Other Forms of Resolutions**

19 If a written proposal for a resolution has been submitted, the resolution may be taken by circular letter or pdf document sent by email, unless a Director requests a discussion in a formal meeting. A resolution by circular letter shall require the approval of all the members of the Board.

**G.     Minutes**

20 Minutes of the meetings of the Board shall be taken. Such minutes shall in particular contain the declarations made by any one member with the request to be included in the minutes as well as all the resolutions.

21 The minutes shall be signed by the Chairman of the meeting and the Secretary.

**H.     Information**

22 Each member of the Board may at all times request information about all matters concerning the Company and its business.

23 At meetings, all persons engaged in the management of the Company shall be required to provide the information requested. Outside meetings, each Board member has the right to request information from the Senior Management regarding the general business affairs and, with the approval of the Chairman, also regarding particular business transactions.

24 The Board shall be proactively provided with all information relating to the business of the Company and all persons involved in the management of the Company shall provide each of the Managing Directors with all information reasonably requested by each of them.

## I.       Remuneration

25   The Board shall with a supermajority quorum of 50% determine the remuneration and employment terms of the Board members (or changes thereof).

26   Upon presentation of appropriate receipts, a Managing Director shall be reimbursed by the Company for all business expenses (including travel costs and hotel accommodation).

## V.       Senior Management

27   The management of the Company is entrusted to the Company's Senior Management. Senior Management is appointed by the Board. The Board shall determine the responsibilities, remuneration and employment terms of Senior Management.

## A.       Composition

28   The Senior Management shall be composed of the following members with the indicated main responsibilities:

- Chief Executive Officer (CEO); the CEO is responsible for leading the development and execution of the Company's long-term strategy.

- Chief Financial Officer (CFO); the CFO is the corporate officer primarily responsible for managing the financial risks of the corporation. This officer is also responsible for financial planning and record-keeping, as well as financial reporting of complete and comprehensive financial information

- Chief Operations Officer (COO); The COO is responsible for the daily operation of the company, and routinely reports to the Board

- Chief Strategic Officer (CSO); main responsibilities: The CSO is responsible for assisting with developing, communicating, executing, and sustaining corporate strategic initiatives.

- Chief Marketing Officer (CMO); CMO's primary responsibility is to generate revenue by increasing sales through successful marketing for the entire organization, using market research, pricing, product marketing, marketing communications, advertising and public relations.

29   and any other officers as the Board may determine from time to time.

## B.       Organization

30   The Senior Management shall be headed by the CEO. The CEO shall be responsible for the management of the Company and each member of the Senior Management shall report directly to the CEO.

## C.      Meetings

31   The Senior Management shall meet at least monthly and whenever a meeting is requested by one of its members. Meetings may also be held by video or telephone conference unless a member requests a discussion in a physical meeting.

## D.      Functions

32   The management of the Company shall be delegated to the Senior Management to the extent the management is not by law, the Articles or these Regulations reserved to the Board. Without limiting the generality of the foregoing, the Senior Management shall implement the business policies of the Company, establish the business plan, under the Board's supervision and control, and manage the day-to-day business of the Company.

## E.      Reporting

33   The members of Senior Management shall, as a rule, report to the CEO.

34   At each meeting of the Board, the CEO, or, if so required by the Board, any member of the Senior Management, shall inform the Board on the state of affairs of the Company so as to allow the Board to comply with its statutory duty to ultimately manage and supervise the Company. If deemed necessary or appropriate, the CEO or the Board may request the participation of other officers.

35   At any time, the CEO shall without delay report to the Board any and all significant changes, developments and events affecting the business of the Company.

## VI.     Signing and Signing Authority

36   The Board appoints the persons authorized to represent the Company and sign on its behalf respectively it determines their signing authority. Execution of agreements on behalf of the Company shall whenever possible occur in Switzerland, particularly strategic and material agreements. Execution copies of each agreement will be filed at the Company's address. Where applicable, Board minutes confirming the quorum approval for a specific contract will be filed attached to the Company's execution copy. Unless otherwise resolved by the Board, each of its members, except the Swiss resident CFO who has sole signing rights, shall have joint signatory power by two (*Kollektivzeichnungsberechtigung zu Zweien*). The CFO is solely entitled to grant bank proxies.

## VII.    Governance

## A.      General Principles on Asset Management

37   The physical assets of the Company shall be managed according to recognized commercial principles. The risk shall be diversified. Thereby, the physical assets shall not be endangered by speculative transactions, but does not need to be invested gilt-edged either.

## B. Governance on Business Partners and Parties

38 The Company strives to do business with Business Partners of sound business character and reputation. One essential objective is to uphold ethical standards both in internal affairs and in interactions with other corporate entities as well as individuals, non-profit organisations, non-governmental organisations and governments.

39 The Company shall make sure that the Business Partners and the Parties are aware of the fact that the Company is co-building a new business environment based on new decentralized ledger technologies and applications in the crypto space. The Company shall suggest to its Business Partners:

   a) Inspection and on-site audit rights upon first request by the Company;

   b) Information rights with regard to contractual performance and legal compliance; and

   c) Immediate termination and/or veto rights for agreements and/or execution of Agreements with the Company compliant with laws, regulations, codes of conduct, codes of ethics, and policies initiated or accepted by the Company, and this Regulation.

## C. Organizational Governance

40 The Company shall maintain a risk-based organization, which allows a sufficient control over its activities. Amongst other things the Bodies and its Employees are responsible for the compliant execution of the following:

   a) Financial transaction oversight including accounting, preparation of the annual accounts, budget and liquidity planning, being knowledgeable about who has access to the organization's funds, and any outstanding bills or debts owed, developing systems for keeping cash flow manageable;

   b) Timely submission of tax returns, tax payments,

   c) Legal, regulatory and tax compliance;

   d) Approval and execution of contracts:

   e) Representation of the Company, regulation of signatory rights;

   f) Compensation schemes and

   g) Keeping and maintaining records of relevant business activities and corresponding resolutions.

41 Any Body or Employee shall immediately inform the Board about the following (actual, threatening or expected) events:

   a) Regulatory matters, authority requests and investigations;

   b) Any change of business plan, strategy of purpose, strategic alliances; and

c) Any change of control of a Business Partner.

**D.     Financial Governance**

**1.     Accounting**

42 The accounting records shall be kept at the registered office of the Company, or such other place as the Company may think fit, and shall at all times be open to inspection by each of the Board members.

43 The accounting records shall be such as to disclose with reasonable accuracy the financial position of the Company, to provide proper audit trails for internal/external/tax audits and to permit observance of all laws, statutes, rules and regulations, with particular regard to taxes, duties, VAT, depreciation etc.

**2.     Financial Planning**

44 The process of financial planning shall ensure the Company's objectives to be achieved; the strategic direction which will be followed in order to achieve the Company's objectives; the resources required to implement the agreed strategic direction; the impact upon the value of the Company's funds (in fiat and in cryptocurrencies); the major business and financial risks which may prevent achievement of the Company's objectives and their potential impact upon the values held by the Company.

45 The Business Plan shall be drawn up and adopted annually and state the following items:

a) Scope of business to be exploited (and hence level of financial risk) and all of the businesses controlled by the Company;

b) Forecast of the Company's objectives and strategic directions to be followed attained as well as strategies, financial policies and tools to attain the goals;

c) Forecast of the financial outcomes for the Company and its projects as a whole, taking into account all major project and financial risks likely to be incurred during the plan period; and

d) Budgets for the Company`s major projects.

**3.     Financial Control**

46 A system of internal controls shall be established and maintained in order to safeguard the assets of the Company, achieve completeness and accuracy of all records, enable the Company to be managed in an orderly and efficient manner and to achieve adherence to management policies.

47 The internal control system shall ensure that project performance against Business Plan and Budget is fully monitored and that timely implementation of necessary changes in such plans and budgets are achieved.

48 Any net token launch/TGE proceeds received by the Company shall be released only with the consent of 50% of the Board.

### VIII.   Business Principles

### 1.     Arm's Length

49  Any services provided or obtained by the Company shall be paid on a «arm's length» basis:

    a)    Any „cost-plus" mark-up shall be comparable with third party transactions;

    b)    The principle is generally applicable to transactions and contractual relationships with affiliated parties of the Company and its shareholders as well as with Business Partners in- and outside of Switzerland.

### 2.     Effective Place of Management

50  The effective place of business shall be the legal seat of the Company.

### IX.    Legal Compliance

51  The Company shall ensure that all its activities are in compliance with the laws of Switzerland and any other country in which the Company is doing business. This particularly includes:

    a)    Anti-bribery or anti-corruption laws;

    b)    Antitrust laws, Financial Reputations;

    c)    Prohibitions on money laundering or financing terrorism; and

    d)    Export and trade control regulations.

52  The Company is prohibited from engaging in any financial transaction involving property, funds or monetary instruments which promotes or results from criminal activity punishable in Switzerland or any other country in which the Company is doing business, or aid and abet in hiding the proceeds of terrorism or other criminal activity. Covered Individuals shall not aid, abet or become involved in any engagement which violates these Regulations, as further described in the Company's Compliance Handbook.

53  The Company is responsible for ensuring that it at all times complies with restrictions or possible licensing requirements of the competent Financial Market Supervisory Authority (FINMA) or any other authority as required by law that are materially applicable to the Company and its business.

### X.     Conflicts of Interest

54  A conflict of interest may arise when a Body, shareholder of the Company, Employee, Business Partner or a Party takes actions or has interests that may make it difficult to perform his duties and responsibilities for the Company. All such conflicts shall be avoided.

55  Particular areas of conflict of interest that are of concern include:

a) **Personal financial gain:** Every Party shall avoid any situation that may involve, or appear to involve, a conflict between their personal interests and the interests of the Company. In dealing with current or potential Business Partners, he/she shall act in the best interests of the Company. He/she shall not seek to gain personal advantage because of his/her position. He/she shall make prompt and full disclosure to his supervisor or the Board of any situation that may involve a conflict of interest.

b) **Insider trading:** The Board is aware of the dominant role of highly volatile cryptographic tokens, including but not limited to ETH and SNGLS, in the activities of the Company, and the potential large impact of actions taken by the Board, Employees and other involved parties on the value of these tokens as well as their current uncertain regulatory status, insider trading is a prime concern.

56 Bodies or Employees shall:

a) At no point take out options, forward contracts, contracts for difference or other financial contracts on SNGLS or SNGLS-based tokens with the intent of personally profiting from Confidential Information,

b) At no point make decisions that affect the value of SNGLS or SNGLS-based tokens with the intent of increasing the value of their personal current or anticipated portfolio of said tokens, and

c) At no point provide Confidential Information to others when there is reasonable suspicion that this information will be used to conduct trades that would be forbidden for the covered individual themselves.

57 "**Confidential Information**" in this section is taken to include any information about current and planned actions of the Company or a Party that is not available to the general public.

## XI.    Outside Activities

58 Bodies and Employees shall not have outside employment (for themselves or others) or activities that compete with the Company which could have a negative impact on the performance of their duties for the Company, except as approved by the Board.

## XII.    Nepotism

59 Bodies and Employees shall:

a) Disclose all situations in which they may have control or influence over an actual or potential relationship with an employee or business partner where the individual or a director, owner or beneficiary of the entity in question is a family member of such Body or Employee, and

b) Excuse themselves from voting decisions or positions of authority relating to such employees or business partners. Any individually authorised representatives of the Company will in such case at all times refrain from using this individual signing authority.

### XIII. Bribery and Improper Payments and Transactions

60  An "**Improper Payment or Transaction**" under this section shall be considered to include any payment or gift to an officer, employee or director of individuals, companies, governments or other organizations for the purpose of influencing their resolutions, activities and decisions, inducing that person to do or omit to do any act in violation of his lawful, statutory or even contractual duty, or securing any improper advantage in order to assist in obtaining or retaining business or in directing business to any other party.

61  It is the Company's policy to conduct all its business in an honest and ethical manner. The Company all its Employees globally take a zero-tolerance approach to Bribery and Corruption and are committed to acting professionally, fairly and with integrity in all of their business dealings and relationships wherever operating. The Company is committed implementing and enforcing effective systems to counter bribery.

62  The Company will uphold all laws relevant to countering bribery and corruption in all the jurisdictions in which the organization operates and remains bound to local and national laws including but not limited to US FCPA, UK Bribery Act and Swiss anti-corruption regulations.

63  In any event, prior to acceptance, all hospitality, entertainment and gifts shall be reported by all Bodies and Employees to the Compliance Manager, who shall closely monitor these as to frequency and amount to ensure that cumulatively they do not create the appearance of impropriety or result in an improper payment or transaction or a violation of any applicable laws and regulations.

64  None of the Bodies or Employees

    a)    may give or receive an improper payment or transaction;

    b)    may give or receive gifts, gratuities or entertainment beyond what is customary, reasonable and lawful; and

    c)    receive kickbacks, rebates or commissions.

### XIV. Confidentiality and Privacy

65  It is prohibited to disclose any confidential information of the Company including intellectual property and trade secrets (including development and production information, formulations, technical specifications, technical drawings, internal communications, business plans, marketing and sales programs, customer lists, pricing policies, and company financial information other than that published in the Company's annual or periodic public reports) with any third party without a Managing Director's written approval.

66  Every Party is obliged to protect the Company's(ies') confidential information as well as that of its customers, suppliers and third parties who have disclosed information to the Company(ies) in confidence. The obligation to maintain confidentiality extends beyond the termination of the relevant relationship. Every Party must comply with applicable data protection laws when handling personal information (e.g. personal information about an individual's identity, personal financial or credit information; or health and family matters).

## XV.   General Provisions

67 Resolutions of the Board regarding the amendment of these Board Regulations require the unanimous approval of all members of the Board.

## XVI.   Miscellaneous

### A.   Effectiveness

68 These Regulations shall become effective as of the day hereof.

### B.   Modifications and Amendments

69 Modifications and amendments of these Regulations require a resolution by the Board to be adopted by a qualified majority of the members of the Board as set forth in Section IV.E above.

* * *

Zug, 9 Feb. 18



DocuSign Envelope ID: 4F1198D7-4209-4DF0-AB48-728C3C0075FB

**SingularDTV LLC**
(the **Company**)

Registered Office: Zug, Canton of Zug, Switzerland
Enterprise Identification No.: (CHE-143.156.740)

**Minutes of the Meeting of the Managing Directors of the Company** (collectively the
**Board**)
**Held via Videoconference on May 27, 2021**

---

**Present**

‒    Arie Yehuda Levy Cohen, Chairman of the Board ("AYLC")

‒    Joseph Michael Lubin, Managing Director ("JML")

**Absent**

—    Zachary James LeBeau, Managing Director ("ZJL")

**Chairman**

—    Arie Yehuda Levy Cohen

**Secretary**

—    As ZJL declined to attend the meeting and presumably instructed company counsel to do
the same, JML will be acting as secretary.


**A.    Agenda**

   1.    Constitution of the Meeting

   2.    Discussion of compliance incident and resolutions on measures to be taken

   3.    Discussion of the exit of ZJL as CEO of Breaker, effective immediately

   4.    Proposal recommending an orderly dissolution

   5.    Date of the next Meeting of Shareholders

   6.    Miscellaneous

**B.    Business Transacted and Resolutions Passed**

1.    Mr. Levy Cohen takes the chair (the **Chairman**); it being noted that the prior secretary Carl Volz was terminated by ZJL, for purposes of this meeting AYLC and JML agree that JML acts as secretary.

The Chairman opens the meeting at 5PM CEST. He directs the record to show that the meeting of the Board has been duly convened and that a majority of the Managing Directors are present and therefore the Board has a quorum. No objections are raised against these ascertainments.

2.    The Chairman restates the recent compliance incident involving the fraudulent transfer of approximately $2,000,000 USD equivalent of company assets at the time of transfer (the "Compliance Incident").

3.    JML notes that Company assets were always intended to be secured in a multisignature solution and continuing disappointment that the funds were not in an industry standard multisignature solution, that they continue to be held solely by ZJL and that basic compliance measures were not taken prior to the Compliance Incident. JML notes that the assets, as far as he is aware, still remain in the sole possession of ZJL.

4.    The Managing Directors, further to discussions and consideration of all relevant documents, the Managing Directors then resolve as follows:

(a)    Resolved that ZJL is dismissed as CEO with immediate effect.

Voting in Favor:    *Arie Levy-Cohen*    *Joseph Lubin*
80022D447199410    B25D9047BC304A9

Voting Against:

(b)    Resolved that ZJL is expressly instructed to refrain from continuing holding personal control over or disposing of any (digital) assets that belong to the Company (e.g., by way transferring, assigning or selling assets to third parties, or using them in any other way), or otherwise taking any action in relation to such assets that have the effect of depriving the Company from exercising exclusive control over such assets. The Company shall provide ZJL with a wallet address (the "Address"). The Address will be a multisignature wallet with at least 2 out of 3 signatures required, of which at least 2 will be Company employees with fiduciary obligations. ZJL shall effect a transfer of all Company assets under the direct or indirect control of ZJL to the Address within 48 hours of his receipt of the Address, the legitimacy of which shall be confirmed and authenticated using video conferencing. ZJL is also further instructed to provide to the Company all documentation and information required or appropriate for the Company to be able to regain immediate control of its digital and other assets belonging to the Company, including, but not limited to, the documentation and information, including the private key, with respects to the accounts, custodians or wallets in which any such (digital) assets are held for any address containing digital assets which ZJL does not cause a transfer to the Address within 48 hours. Resolved that the Company shall be authorized to take any action necessary against ZJL in a personal capacity in order to fulfill this resolution.

Voting in Favor:    *Arie Levy-Cohen*    *Joseph Lubin*
80022D447199410    B25D9047BC304A9

Voting Against:

(c)    It is resolved that all signatory authorities and powers to act in the name and on behalf of the Company granted to ZJL are herewith immediately withdrawn. The Board authorizes Patrik Allenspach, and failing his willingness to do so, Mr. Cohen and Mr. Lubin, each acting singly (and not jointly), to instruct all banks and other custodians to cancel any signatory powers of ZJL with respect to accounts of the Company with immediate effect.

Voting in Favor:

Voting Against:

(c)    The Board reminds ZJL that he shall continue to be subject to all confidentiality obligations as a managing director of the Company (no vote required).

(d)    It is resolved that the Board shall form a Dissolution Committee. The purpose of the Dissolution Committee, which ZJL is invited to be a part of should he so choose, is to conclude a proposal for an orderly wind-down of the Company as soon as is practicable. The Dissolution Committee shall be co-chaired by Joseph Lubin and Patrik Allenspach, and any such members as appointed by the Board in the ordinary course. The Dissolution Committee will, among other actions standard for such committees:

- Continue working with forensic authorities regarding the Compliance Incident in an attempt to recover the lost assets;
- Continue working with Patrik Allenspach to finalize all remaining tax obligations of the Company;
- Appoint a third party to complete an accounting of all debts, if any, owed by shareholders, directors, and/or employees, to the Company;
- Make a proposal for the Shareholders regarding how the remaining Company assets may be allocated to limit liability, promote the interests of SNGLS token holders, and potentially, continue on some aspects of the business; and
- The Dissolution Committee is expressly authorized to engage third party professional services in Switzerland as required to conclude this analysis.

Voting in Favor:

Voting Against:

5.    The Board resolves that any spending on content, if any, that is taking place be ceased immediately, and that the Company takes all steps to completely exit any remaining obligations for the production of content, effective immediately.

Voting in Favor:

Voting Against:

6.    The Board resolves that any relationship between the Company and Breaker LLC shall be terminated by the Company as soon as possible.

DocuSign Envelope ID: 4F1198D7-4209-4DF0-AB48-728C3C0075FB

Voting in Favor:   Arie Levy-Cohen  Joseph Lubin

Voting Against:

7.   The Board resolves to convene an extraordinary general meeting of shareholders on July 1, 2021, for the purposes of voting on recommendations from the Board as described herein, as well as any proposals from the Dissolution Committee that are ready to be effected.

There being no further business to be transacted, the Chairman closes the board meeting.

[*signatures on the next page*]

DocuSign Envelope ID: 4F1198D7-4209-4DF0-AB48-728C3C0075FB

Executed as of the date written on the cover page to these resolutions

The Chairman:                                    The Secretary:

_Arie Levy-Cohen_
60022D44719941D...

_Joseph Lubin_
B25D9047BC304A9...

Arie Yehuda Levy Cohen

**Distribution:**

_ Domicile
_ Managing Officers

**Von:** Matt Corva <matt.corva@consensys.net>
**Gesendet:** Dienstag, 1. Juni 2021 19:18
**An:** Zach LeBeau <zachlebeau@gmail.com>; Zach LeBeau <zlebeau@breaker.io>; Zach LeBeau
<zlebeau@breaker.io>; Niklaus.Zyndel@bankfrick.li
**Cc:** Joseph Lubin <joseph.lubin@consensys.net>; Arie Y LEVY COHEN <arielevycohen@gmail.com>; Patrik Allenspach
<pallenspach@breaker.io>
**Betreff:** Transfer of SingularDTV GmbH ETH to Bank Frick

Zach,

On behalf of Joe acting as Director and per the attached resolutions and subsequent communication, please see
below instructions for transferring ETH assets of SingularDTV GmbH to the SingularDTV GmbH Bank Frick Wallet.

The recipient wallet address for SingularDTV GmbH at Bank Frick is:
0x62f089F522083a3012d10C35017DF964449432f9

You will work with Niklaus Zyndel from Bank Frick, copied, for the transfer. The transfer must be done inclusive of a
test transaction as specified by Niklaus, with confirmation via separate channels (e.g. video/email).

We will also be following up with an address for the transfer of any SNGLS or other ERC20 tokens held by you
personally and we are working with Bank Frick to determine whether they can facilitate that.

The Board requires you to perform this transfer of ETH within 48 hours of 12 PM CET, June 2, 2021. If you have any
questions, please feel free to reach out to Joe. If you need help coordinating with Niklaus, please let us know and we
can arrange a meeting.

Matt

Virenfrei. www.avast.com



**Protokoll inkl. Klagebewilligung**
**Schlichtungsverhandlung von Donnerstag, 2. Dezember 2021, 16:00 Uhr (Dossier-Nr. 563/21)**

**In Sachen**
Herr **Zachary James LeBeau**, 348 West 57th Street, #175 New York, NY 10019, USA
vertreten durch: Rechtsanwalt Niklaus Glatthard und/oder Rechtsanwalt und Notar Dr. Melchior Glatthard, Advokatur & Notariat Glatthard, Limmatquai 80, 8001 Zürich

**gegen**

**SingularDTV GmbH**, Poststrasse 30, 6300 Zug

**Anwesende**
**Friedensrichter**
Johannes Stöckli

**Klagende Partei**
Herr **Zachary James LeBeau**, 348 West 57th Street, #175 New York, NY 10019, USA
vertreten durch: Rechtsanwalt Niklaus Glatthard, Advokatur & Notariat Glatthard, Limmatquai 80, 8001 Zürich, gehörig bevollmächtigt

**Beklagte Partei**
**SingularDTV GmbH**, Poststrasse 30, 6300 Zug
vertreten durch: Patrik Allenspach, Zeichnungsberechtigter EU
verbeiständet durch: RA Dr. Michael Mráz, Wenger Vieli AG, Dufourstrasse 56, 8034 Zürich

---

**betreffend Forderung:**

**Rechtsbegehren der klagenden Partei gemäss Schlichtungsgesuch vom:**
**(Poststempel 25. September 2021; Eingang beim Friedensrichteramt 27. September 2021)**

1. Es sei die Beklagte gestützt auf Art. 821 Abs. 3 OR gerichtlich aufzulösen, die Liquidation durch eine(n) neutrale(n), gerichtlich bestimmte(n) Liquidator/-in anzuordnen;

2. *Eventualiter* sei gemäss Art. 821 Abs. 3 OR auf eine andere sachgemässe und den Beteiligten zumutbare Lösung zu erkennen;

3. Es seien die Auflösung der Beklagten sowie die/der ernannte Liquidator/-in, eventuell die Wirkungen einer anderen sachgemässen Lösung, zur Eintragung in das Handelsregister anzumelden.

Unter Kosten- und Entschädigungsfolgen, inkl. MwSt., zu Lasten der Beklagten.

**Rechtsbegehren der beklagten Partei mündlich an der Verhandlung vom 2. Dezember 2021:**

1. Die Rechtsbegehren des Klägers seien vollumfänglich abzuweisen, der dargestellte Sachverhalt wird in allen Teilen bestritten.

2. Unter Kosten- und Entschädigungsfolgen, inkl. MwSt., zu Lasten des Klägers.

**Mit schriftlicher Eingabe, übergeben anlässlich der Verhandlung vom 2. Dezember 2021, erhebt die Beklagte Widerklage mit den folgenden Rechtsbegehren:**

1. Es sei der Kläger und Widerbeklagte, unter Androhung der Bestrafung im Widerhandlungsfalle gemäss Art. 292 StGB, zu verpflichten, der Beklagten und Widerklägerin spätestens bis 5 Tage nach Rechtskraft des Urteils die sich auf der Ethereum-Blockchain im Wallet mit der Adresse 0xc78310231aA53bD3D0FEA2F8c705C67730929D8f befindlichen 12'000.415454144426866188 Ether auf das sich auf der Ethereum-Blockchain befindliche Wallet mit der Adresse 0x62f089F522083a3012d10C35017DF964449432f9 zu übertragen sowie Schadenersatz in der Höhe der gerichtlich festzustellenden Wertverminderung der 12'000.415454144426866188 Ether zwischen dem 2. Juni 2021 bis zum Urteilszeitpunkt nebst Zins zu 5% seit dem 2. Juni 2021, zu bezahlen

2. Für den Fall der Nichterfüllung innert der Frist nach Ziffer 1 sei der Kläger und Widerbeklagte zu verpflichten, der Beklagten und Widerklägerin den vom Gericht zu bestimmenden Geldwert in USD der 12'000.415454144426866188 Ether im Urteilszeitpunkt nebst Zins zu 5 % seit dem Urteilszeitpunkt sowie Schadenersatz in der Höhe der gerichtlich festzustellenden Wertverminderung der 12'000.415454144426866188 Ether zwischen dem 2. Juni 2021 und dem Urteilszeitpunkt nebst Zins zu 5% seit dem 2. Juni 2021, zu bezahlen.

3. Der Kläger und Widerbeklagte sei zu verpflichten, der Beklagten und Widerklägerin Schadenersatz in noch zu bestimmender Höhe, jedoch nicht unter CHF 2 Millionen zu bezahlen.

4. Alles unter Kosten- und Entschädigungsfolgen zulasten des Klägers und Widerbeklagten.

**Nichteinigung/Klagebewilligung (Art. 209 ZPO)**

1. Nichteinigung.

2. Antrag der klagenden Partei auf Ausstellung der Klagebewilligung.

**ergeht folgende Verfügung:**

1. Es wird festgestellt, dass sich die Parteien nicht geeinigt haben (Art. 209 Abs. 1 ZPO).

2. Der klagenden Partei wird die Klagebewilligung erteilt (Art. 211 Abs. 2 lit. b ZPO).

3/4

3. Nach Eröffnung berechtigt die Klagebewilligung während dreier Monate zur Einreichung der Klage beim Kantonsgericht Zug (Art. 209 Abs. 3 ZPO i.V.m. § 27 Abs. 1 GOG). Bezüglich der Klageschrift sind die Vorschriften von Art. 131 ZPO, Art. 221 ZPO (ordentliches Verfahren) bzw. Art. 243f ZPO (vereinfachtes Verfahren) zu beachten (siehe Rückseite).

**Nach Erteilung der Klagebewilligung ergeht folgende Verfügung:**

1. Von der Nichteinigung im Schlichtungsgesuch wird Vormerk genommen und das Verfahren Nr. 563/21 als erledigt am Protokoll des Friedensrichteramtes Zug abgeschrieben (Art. 209 ZPO).

2. Die Kosten des Schlichtungsverfahrens von CHF 500.00 werden der klagenden Partei auferlegt. Sie hat diese mittels Vorschuss bezahlt.

3. Mitteilung an: Parteien (Eingeschrieben)

Zug, 6. Dezember 2021



Friedensrichteramt Zug
Johannes Stöckli, Friedensrichter

Beilagen
- Teile der eingereichten Beilagen retour an klagende Partei

Geht per Einschreiben an
- Rechtsanwalt Niklaus Glatthard und/oder Rechtsanwalt und Notar Dr. Melchior Glatthard, Advokatur & Notariat Glatthard, Limmatquai 80, 8001 Zürich
- RA Dr. Michael Mráz, Wenger Vieli AG, Dufourstrasse 56, 8034 Zürich

**Eingaben der Parteien:**

**Art. 131 ZPO** Anzahl

Eingaben und Beilagen in Papierform sind je einem Exemplar für das Gericht und für jede Gegenpartei einzureichen; andernfalls kann das Gericht eine Nachfrist ansetzen oder die notwendigen Kopien auf Kosten der Partei erstellen.

**Ordentliches Verfahren:**

**Art. 221 ZPO** Klage

[1] Die Klage enthält:

    a. die Bezeichnung der Parteien und allfälliger Vertreterinnen und Vertreter;

    b. das Rechtsbegehren;

    c. die Angabe des Streitwerts;

    d. die Tatsachenbehauptungen;

    e. die Bezeichnung der einzelnen Beweismittel zu den behaupteten Tatsachen;

    f. das Datum und die Unterschrift.

[2] Mit der Klage sind folgende Beilagen einzureichen:

    a. eine Vollmacht bei Vertretung;

    b. gegebenenfalls die Klagebewilligung oder die Erklärung, dass auf das Schlichtungsverfahren verzichtet werde;

    c. die verfügbaren Urkunden, welche als Beweismittel dienen sollen;

    d. ein Verzeichnis der Beweismittel.

[3] Die Klage kann eine rechtliche Begründung enthalten.

**Vereinfachtes Verfahren:**

**Art. 243** Geltungsbereich

[1] Das vereinfachte Verfahren gilt für vermögensrechtliche Streitigkeiten bis zu einem Streitwert von 30 000 Franken.

[2] Es gilt ohne Rücksicht auf den Streitwert für Streitigkeiten:

    a. nach dem Gleichstellungsgesetz vom 24. März 1995;

    b. wegen Gewalt, Drohung oder Nachstellungen nach Artikel 28b ZGB;

    c. aus Miete und Pacht von Wohn- und Geschäftsräumen sowie aus landwirtschaftlicher Pacht, sofern die Hinterlegung von Miet- und Pachtzinsen, der Schutz vor missbräuchlichen Miet- und Pachtzinsen, der Kündigungsschutz oder die Erstreckung des Miet- oder Pachtverhältnisses betroffen ist;

    d. zur Durchsetzung des Auskunftsrechts nach dem Bundesgesetz vom 19. Juni 1992 über den Datenschutz;

    e. nach dem Mitwirkungsgesetz vom 17. Dezember 1993;

    f. aus Zusatzversicherungen zur sozialen Krankenversicherung nach dem Bundesgesetz vom 18. März 1994 über die Krankenversicherung.

[3] Es findet keine Anwendung in Streitigkeiten vor der einzigen kantonalen Instanz nach den Artikeln 5 und 8 und vor dem Handelsgericht nach Artikel 6.

**Art. 244** Vereinfachte Klage

[1] Die Klage kann in den Formen nach Artikel 130 eingereicht oder mündlich bei Gericht zu Protokoll gegeben werden. Sie enthält:

    a. die Bezeichnung der Parteien;

    b. das Rechtsbegehren;

    c. die Bezeichnung des Streitgegenstandes;

    d. wenn nötig die Angabe des Streitwertes;

    e. das Datum und die Unterschrift.

[2] Eine Begründung der Klage ist nicht erforderlich.

[3] Als Beilagen sind einzureichen:

    a. eine Vollmacht bei Vertretung;

    b. die Klagebewilligung oder die Erklärung, dass auf das Schlichtungsverfahren verzichtet werde;

    c. die verfügbaren Urkunden, welche als Beweismittel dienen sollen.