# EXHIBIT 10



# Minutes

of the

# 4th Board Meeting 2018

of

# SingularDTV GmbH

held on Tuesday, 11 September, 2018

10.30 am – 12.30 am ET

At the offices of SingularDTV LLC, 40 Fulton Street, New York

**Attendees**:

- **Arie Levy-Cohen,** CFO / Board Member / Chair

- **Zachary LeBeau,** CEO / Board Member

- **Joseph Lubin,** Board Member

- **Kim Jackson,** Co-Founder

- **Carl Volz,** US General Counsel, SingularDTV LLC

- **Patrik Allenspach,** Project Manager, Codex Execution GmbH

- **Amrita Rizal,** Head of Compliance, SingularDTV GmbH

- **Simon Waelti,** Head of Legal, SingularDTV GmbH

- **Ed Greenwood,** Financial Controller, SingularDTV LLC

- **Shreesh Tiwari,** Head Business Strategy, SingularDTV LLC

**Agenda:**

1. Introductions

    - Attendance list

    - Approval of minutes of the last BoD meeting

2. Pending Items

    - Corporate Structure / Corporate Governance

        o Elect Kim Jackson onto Board of Directors (to commence during shareholders meeting); role as COO

        o Transition plan GmbH to US public entity; approval of phase 1 (fact finding of legal/tax assessment re transition)

        o Future role of Arie Levy-Cohen Chairman of the Board of SingularDTV GmbH / appointment of new local director

        o Hiring a new CFO (interim in CH, long term in US)

        o Scope of Ed Greenwood as Controller

        o Form holding company in Zurich

    - Banking Relationship / Reverse KYC

        o USD in Credit Suisse AG

    - Token assessment – future path and roadmap for SingularDTV GmbH

        o SNGLS 1.0 – 3.0 - $ 1 Billion IPO

- o SNGLS: the 400 million founders tokens

- Japan TGE

- Blockhaus

    - o Examination of overall revenue/obtain percentage of ownership/profit

- Tokit and regulated Crowdfunding

- SingularX

- High risk transactions on Tokit (without KYC)

3. Patent of SingularDTVFinances

4. Project Updates

    A. Film Projects

    B. Rentalist

    C. Reg A and Tokit as a CF platform Offering for US

5. Schedule future board meetings

1. **Introductions**

Attendance list and minutes of last board meeting are being approved.

2. **Pending items**

**Corporate Structure / Corporate Governance**

**Election of Kim Jackson**

Simon opens the meeting, re-explains the agenda and the first item to be the election of Kim Jackson to the board of the company.

Joe: I first would like to know more about the company, where it stands right now, all liabilities and businesses, before deciding on electing new persons to the board.

Kim: but that was discussed long time ago

Joe: I did not vote on your election.

Kim: it was discussed in April, Arie and Zach have discussed this then.

Zach: the reason for and the goal of the election of Kim to the board is to regain balance in the company. Kim currently is not formally and properly involved in any decision of the board, her election would simply give her a voice.

Kim: since Joe is not around a lot, and Zach and Arie taking care of other things but not focusing on pressing issues such as financial stability, I am the only one asking these questions. But from a legal perspective, I do not have any authority in the GmbH.

Joe: we are trying to consolidate all information in one place, aren't we?

Carl: it is currently being discussed; there are however on GmbH level also legal concerns how to share all documents with people that are not board members of the GmbH

Kim: we have seen numbers with reference to agreements, we have not seen them all yet, I think I can help oversee the organization better when having access

Joe: Carl, do you believe she should be a member. Why?

Carl: the LLC is the main part of the company, so she should be a part of this. Kim was running the LLC since the incorporation.

Joe: but the GmbH does not own the LLC though, there is only a service agreement. So with this clear separation, this is not necessarily a valid reason. Why is it structured that way, why does the GmbH not own the LLC?

Kim: I do not know

Joe: Should then not be a balance? Some projects are not owned by the GmbH, should they not be owned by the GmbH? Should then not the same apply for the LLC?

Kim: that would be fine by me.

Joe: the US entity is considered a piece of Singular, so it should be owned by the GmbH?

Carl: liability and tax considerations spoke strongly for a separation. Also privacy restrictions are stronger in Switzerland and Europe.

Zach: still, Kim is also made aware on everything.

Arie: the reason for the separation between the LLC and the GmbH (and no respective ownership in each other entity) in my view has to do with liability. Because the LLC is active and has presence in the US, but the launch was done in Switzerland, it was decided to have this separation.

Joe: currently I am mainly representing Consensys' interest. I do not have enough information about SingularDTV GmbH, obviously there are two sides to all these stories, I do not like to decide on anything that could affect either side without having the full picture.

Arie: I agree that this is premature; the idea is to have a mandate to find out all the implications and then make any decision and change

Joe: our founders call a month ago was constructive; I also hear that Arie is discussed to be moved out of the project. Arie, do you want to be moved out?

Arie: not like this.

Joe: what do you want to be happening right now?

Arie: decisions are being made mid-stream, the current CFO [Iwona] is not even present in this board meeting, although the closing of the books is ongoing right now, this process should be done all together. Changes can be made in the future; especially if the mean and initiate a transfer to a more professional board/management in which I do not have to be a part of either. But taking over mid-stream to me seems not wise.

Joe: there is a plan to restructure. Why is voting Kim into the board necessary?

Carl: in order to have her access to all the information.

Joe: there are other ways for her to have access to all the information. I would like to understand what happened before deciding on any changes.

Zach: Patrik, the transition will take months, correct?

Patrik: first there will be an assessment to find out what can and should be done, this will take 1-2 months, including defining milestones.

Joe: I do not see why Kim cannot have access to all the information even now.

Simon: The main problem is that the LLC and GmbH are not in the same group, so any transfer of information is legally speaking a transfer between two independent entities and thus there must me respective measures implemented, adhered to and respected by both entities.. That said, the current set up with the service agreement does not cover and give us enough reassurance as with regards to the treatment of confidential information such as personal data. It is only a service agreement that empowers the LLC to act as a production node. Now, it is clear that this set up does not reflect all that is intended and what should be implemented. Also, most of the GmbH information can be shared if Kim is legally connected in some role to the GmbH, but e.g. employment agreements and all other documents that include personal information cannot be shared cross border. Kim could be mandated in a different way to have legal access at least on-site in Switzerland.

Joe: I still do not understand all what happened in the GmbH. I would rather not make that decision on election somebody new to the board right now. Kim, I would like you to be fully involved, but I would like not to make any rushed decisions.

Kim: there is financial chaos on both sides. It's been a year and a half, and there is not proper bookkeeping. There is necessity for a restructure. There is a lot of information that none of us have, no board member, nobody else like me. E.g. financial transactions must be approved by the board, I would not do it if I were you. We need a real CFO, we need a smaller footprint in Switzerland.

Simon: currently, 14 people are being employed in Switzerland.

Kim: there are two offices, and some projects that we do not know about. Not even Simon as the legal counsel has access to all the information.

Joe: Arie, is this description accurate?

Arie: Iwona is not here, so it is impossible to explain how we got here. There are a variety of factors that brought us to this point, with different projects, delays, etc. that include the financial situation. Also the crypto situation at the moment is difficult. Finally, many transactions have been done with wallets that are not under the control of the company. We were working hard to input all the data to finally have the financial reports, but it is a lengthy procedure right now.

Process right now is almost to give birth to the consequences of the difficulties and hurdles. The restructuring will force us to face all the difficulties that we were created by us. The restructuring is something in line with our initial conversation.

It is not accurate to put the responsibility on Iwona and finance.

Joe: so Arie, where are you now, where do you stand? Do you have a clear overview over the finances?

Arie: Iwona is unfortunately not here. She should be allowed to present the finances she had been working on for a year.

Kim: Iwona shared this three documents with us a month ago, without any additional information and/or data. She has quit, so she will leave within a couple of weeks.

Ed: we are still talking about the financials for 2017, we do not have an overview for 2018.

Kim: when I look at the employees list, there is a bookkeeper, but we do not have books for the company.

Shreesh: Joe, we will be happy to share more business information about SDTV with you wherever and whatever you require. We need to be active right now, so there is necessity to be active about that.

Patrik: there are two layers of restructuring: a corporate level, but also with regards to personnel. It has been discussed with Arie and Zach to have an interim CFO currently in the GmbH, before transferring this job to the US potentially.

Arie: I agree to that; however, it would be prudent to have Iwona accompany that person for a smooth transition.

Patrik: we will have interviews with two candidates next week, Kim and Zach are going to be there as well.

Zach: so we will discuss the election of Kim at the end of this meeting? I think Kim would bring a lot of balance to the company.

Simon: the service agreement needs to be reevaluated since many things are done from LLC. Except for employment data, I shared everything that I have received and have gained access to, some agreements are lost or not there anymore, we need to work on that. If we can properly mandate Kim to have access to these documents, this might help a proper restructuring, but it will also mean that she needs to involve her fully into this. We can grant Kim almost all the powers and entitlements to have access and work/effect on the GmbH in other ways, if it should not be accepted or deemed to be valid to have her elected to the board by other directors/shareholders. This at least will grant her full access on-site when she will be in Switzerland, with certain restrictions for cross-border transfer of information and documents that must not be forwarded since the GmbH and the LLC are not companies of the same group, but only legally connected through the service agreement.

Zach: Arie, are you now against or for the election of Kim being a part of the board?

Arie: I am not against that, I would just like it to be what we all want to do, without diminishing anyone. The statement that for months things have been asked for and not given is not accurate; Iwona had to work on many things and to fight to receive all the information so they can be forwarded.

**Transition Plan**

Patrik: the goal is to attain being a US public entity. The GmbH does not necessarily need to be shut down. GmbH is mandated to fulfill the four promises. Transfer of all necessary operations and IP – if possible and need be – to a self-sustaining US company can also be finished after the fulfillment of all the promises.

The GmbH currently owns all the money and the IP.

Joe: the GmbH owns the IP?

Simon: yes.

Joe: the LLC has no banking issues right now, why?

Patrik: my understanding is that LLC is not considered a blockchain company, the GmbH is, that is why the LLC so far has had no banking issue. We seek to have a new bank account for the GmbH with Bank Frick. It seems to be the only valid option at the moment. Frick is actually "pressing" us to open the account, where we also can exchange ETH, etc.

Assessment for the transition plan aims to make clear and allow us to see what currently resides in CH, what in the US. Another aspect is to clearly define what the target in the US is; we do have around 20 work packages to figure out what and how we can transition business to US.

Joe: is it contemplated that Arie would leave the board, or removed?

Patrik: it would neither hinder and enforce that plan. Basically, we would spend the coming 6-8 weeks to define and assess the majority of all legal and tax implications for any potential transition.

Carl: it will be the board's decision what should be done, what structure implemented. That would include the question whether Arie to stay or not.

Patrik: Board, do you agree for the Go-ahead for Transition Phase I?

The Board agrees unilaterally.


**Personal structure of management/future role of Arie**


Zach: Arie, do you have anything to say about this? The balance is gone right now. I would like not to have you as the president. I would rather have Herbert Sterchi on the board.

Joe: why was Herbert removed?

Arie: I was under the impression that we do not need two resident directors, that was not necessary anymore because I had moved there to be the resident director.

Joe: what would Herbert do?

Patrik: he would have signatory authority, including that he would require authorization by the board for any decision.

Zach: I would like to also have then Kim on the board.

Simon: so it would then be Arie, Joe, Zach, Herbert and Kim?

Patrik: also, an interim CFO shall be hired asap, the hiring of a US CFO shall be started to be in place beginning of next year.

Kim: in the meantime, Ed as the controller can work with the interim CFO.

### Scope of Ed Greenwood as Controller

Kim: Ed Greenwood is currently the controller of the LLC. It might make sense to implement him as head treasurer when the treasury department is being formed

Carl: can he be represented as a representative of GmbH so he can have access to the finance information?

Patrik: we can try to find a way how this can be structured, I will work with Simon and Ed on this.

### Form holding company in Zurich

Simon: the holding structure in Switzerland was the goal where Patrik and I are trying to get for some months now. In the course of the transition evaluation, we first need to make the assessment from a tax perspective and see what and how much shall remain in Switzerland, and what shall be transferred to the US. Still, the holding structure does make sense, but it is at this stage not clear what would remain in what entity.

Patrik: we believe it makes sense to have two "baskets", one in CH, one in US, so the transition can be done smoothly when ready.

Joe: it is clever to maintain the IP of the company/group in Switzerland, I know this from my other company – despite of Trump's tax initiatives, we were advised and convinced to keep the IP for tax and regulatory reasons in Switzerland, the rest can be then in the US.

### Banking relationship / Reverse KYC

Patrik: the taskforce was created based on Credit Suisse AG's decision to no longer maintain the relationship with SingularDTV GmbH. Various options were discussed, full KYC of all investors vs reverse KYC on the known investors. We have reviewed about a dozen of potential banks, two remained. No KYC of all initial KYC/token purchasers is necessary, but on the about 30% of the initial purchasers which is acceptable for Bank Frick. So currently, we are working with Bank Frick with positive prospects to getting a bank account.

Simon: Other potential bank might be Hypothekarbank Lenzburg, with reverse KYC in the course of a token swap.

**Token assessment**

SNGLS Upgrade

Zach: SNGLS 1.0-3.0 will be also rely on the transition roadmap.

Shreesh: 1.0-2.0 will add additional functions, also KYC on current token holders, 3.0 will be the listed tokens. In order to move on with this process, it is necessary to move forward with the transition plan.

400 million SNGLS token

Simon explains what the function of these 400 million SNGLS tokens, makes it clear that the token terms clearly state that all (i.e. gross) revenue shall be allocated to the SNGLS token; so it will even be difficult the extract any costs for the GmbH.

Joe: so they (the SNGLS token held by the GmbH) are the only source of inflow/revenue? We then have to think about having different sources of income.

Simon: yes, there is no other inflow, and all revenues from the promises must be allocated to the SNGLS. At the current definition, all (gross) revenue will be allocated to SNGLS token. So any update should consider having a change to that aspect as well, without being at any legal or regulatory (suing) risk.

Zach: only the net revenue shall be pushed to the tokens

Simon: the terms say it differently – all (which includes "gross") revenues are supposed and expected to be allocated to the SNGLS

Joe: that is tricky. I think we will be sued in any way and/or case.

**Japan TGE**

Carl: the TGE was executed by SingularDTV NZ, which is 50% owned by Centrality, 50% by Arie and Zach.

Simon: that is not completely accurate – the NZ company is 100% owned by Aaron MacDonald of Centrality. Also, we have received a legal assessment by Nagashima Ohno & Tsunematsu NY LLP (NOT) stating that there are clear regulatory and civil legal risks for the (Japanese) company that is intended to receive the funds from the TGE; as authorities and courts in Japan could deem the company having colluded with the NZ company that executed the TGE on behalf of the Japanese entity, especially since only Japanese investors have been addressed.

Carl: apologies and thank you Simon for this clarification. The TGE/transaction was being done in consistence with NZ law, the Japanese entity was only envisioned as beneficiary and recipient of the proceeds of the TGE. What we've learned is that NZ entity was under the impression that the TGE was done in accordance with NZ and Japanese law, without however being able to provide any proof and/or document, and they (Centrality) are against any decision to unwind or repay the TGE money. Centrality states that there were discussions with exchanges in Japan, but it is not clear if there was an exchange involved in the TGE, and there is no respective documentation around that. The decision is whether the transfer to the Japanese entity (no subsidiary of GmbH); we do have Japanese legal assessment that there is a possible/potential liability for the Japanese entity. Centrality does not believe that anything was done improperly.

Joe: what do you think?

Carl: we are respectively I am waiting on the last piece from the New Zealand people. We currently do not know if there was an agency relationship between the NZ entity and the exchange in Japan which would be legally required. We yet do not know if the Japanese did play a role or not, and if it only was poorly documented or if there were only talks but no execution through that exchange. The potential danger of any violation of law can be considerable harsh, including jail.

The argument from Centrality against any repayment is to avoid to create bad blood, as well as the risk to lose more business and be at a reputational risk, and the risk to have monetary consequences through the Japanese authority against the immediate risk of having to repay all the money. Also, the process of repaying will be burdensome.

Joe: so it sounds like it might be better to keep the money and cross the fingers.

Zach: also, there was only a small number of investors.

Amrita: the small number of investors does not save us from the outlined regulatory requirements that have possibly not been fulfilled. Besides the number of investors it also matters how much money is being collected; we are over the respective threshold and thus it does not matter if it was only a small number of investors.

Joe: how much was it?

Zach: about 22'000 ETH.

Patrik: if we moved forward, what is the fine amount, and what is the timeline?

Carl: there is no time expectation, I want to say the fine is up to USD 5 million.

Zach: I have a feeling that Centrality will not cooperate in the case of refunding. And the token purchasers are becoming impatient.

Amrita: the tokens have not been released to them. Simon and I do have strong reservations since the fine and other potential legal, regulatory, tax and other consequences due to a potential not fully compliant TGE could fall back on this project and potentially the company.

Simon: I agree. Also, the potential fine is an estimate, I would rather like to know the exact potential number.

Joe: still, I think we should go forward and use the money for what it was intended to be used.

Zach: I would like to see efforts in Japan.

Carl: Centrality does not have documentation, only representation that an exchange was used.

Amrita: I asked that in an e-mail, and both Dan and Aaron confirmed that no exchange was used.

Arie: my concern was always with regards to risk, it seems that you are voting to take the risk. I would have abstained from the TGE if I did have all the information at the time.

Carl: it will be a process, FSA will not immediately fine us with 5 million USD.

Arie: it should be the GmbH, not Zach and Arie as persons owning SingularDTV NZ.

Amrita: it was discussed to have several other players like Centrality be involved in the Japan entity that should receive the funds of the TGE. Currently, Mayu owns 100% of the Japan entity. For now, the New Zealand entity would be the beneficiary of the IP that would be created with the Japanese token.

Simon: my understanding is that the TGE was done via NZ for tax reasons. In the respective bare trust deed that was incorporated for tax reasons – which were not clearly disclosed to us, also we never received any documentation re any respective tax advantage with that structure – it is stated that a company to be defined by SingularDTV GmbH shall be the Beneficiary.

Shreesh: it was purely done for tax reasons through NZ entity.

### Blockhaus

Zach – I am dealing with this directly with Centrality. Arie was offered 30% of the TGE revenues, Arie would have helped there as well. Since they wanted to include CTIA, Arie stepped out of the deal, so they are now going into a completely different direction.

### Tokit regulated CF

Zach: we do have a group that is moving forward to have tokit used in the US as a CF platform.

Joe: is it a legal entity?

Carl: we are assessing this right now, if it should be a subsidiary of GmbH, of the LLC or something else.

Zach: Dan is about to talk about this; there are a variety of projects that could be funded with tokit cf. if we raise to 5-10%, this could mean 10-15 million USD.

Amrita: we can work on this fairly quickly, provided to have a legal and compliance person in place.

### SingularX

Zach: everything is positive so far with the current setup seen by the legal experts. However, the automated order matching may change that assessment. That is why we are thinking about approaching FINMA to get their assessment.

Simon: it is currently owned 50% by SDTV, 50% by Centrality, so I think it might be helpful to at least inform them about our intent to approach FINMA at some point.

Joe: what is the current relationship with them (Centrality)?

Zach: the relationship is very good, I am in constant contact with them.

Simon: Amrita and I however have had some difficulties in getting in contact with them, which would have been beneficial also with regards to the Japan/NZ TGE.

Amrita: as soon as we have Ruben's feedback regarding technical aspects, then we will approach FINMA.

### High risks transactions

Amrita: for the upcoming audit, we have like 30 transactions without KYC, 5 are high risk. Milad has confirmed that this is the future of the blockchain, but we cannot do anything at the time. I would like to make the board aware that this might be a potential risk for the company.

Joe: you can put KYC into it for future use. It may be the case that how it was built it does not apply KYC controls, but an additional layer can certainly be added.

Zach: we will check with Milad.

Joe: can we do the presentation now so I can attend the rest on the phone?

DAN HYMAN makes presentation (see attachment)

**Patent of Singular**

Simon: this is an issue that I wanted to address for some time. I just learned that the patent filed for the SingularDTV ecosystem is not being held by SingularDTV GmbH, but by Codex Puerto Rico, a company with no ties to SingularDTV GmbH or the LLC, but held by Zach an Milad. This to me makes no sense, and I would like to assign the patent to the GmbH.

Zach: in 2017, we were rushed to have the patent provisionally registered, Puerto Rico at that time played a big role in SDTV. Codex PR was supposed to play a part in GmbH, MME and Arie hat reservations about that.

Joe: so you Zach and Milad own the IP?

Zach: we submitted the patents.

Joe: Milad has an agreement with Consensys, so that would be transferred and allocated to Consensys.

Simon: I think it makes sense that this will be transferred and be added to the transition plan.

Zach: agreed.

**Finances**

Simon: Iwona's e-mail sent out on 7 August 2018 that included a document with several transactions and transactions that lack proper documentation.

Kim: what needs to be happening is for Iwona to lead the three board members through this document and have the board members agree or disagree on it.

Zach, Joe and Arie agree.

**Budget Planning**

Patrik: we are talking about the budget that we want to send to Bank Frick. Yesterday there was a discussion with Shreesh and Ed, this afternoon I will conduct a conversation with the marketing department. We would like to show a conservative, realistic budget plan for the next 2.5 years that can be presented to the banks.

Carl: is Frick still asking for this?

Patrik: it is not a pending request, but for future references, if compliance, legal and all other divisions should ask for it it will be helpful to have such a doc at hand.

Shreesh: the important point is that it only covers our promises.

**Tax situation**

Patrik: Iwona sent out an e-mail that CHF 65'000.00 was "reserved" for taxes for 2017. In context to the discussion about how much money can be transferred to the LLC with the tax advisors, this is still being assessed. The MME tax ruling is being questioned right now, so a new ruling is in the making to figure out if and how much GmbH will have to pay in Zug and Zurich. As a conservative person, I would like to reserve CHF 1 million for that figure. There is nothing we can do right now, the documentation is being completed, then MME will talk with the tax authorities. After their verdict, we may be able to talk to the tax authorities, but until then, there is not much we can do at the moment.

We did receive other projections where the tax costs accrue between CHF 300'000 and CHF 8 million. It is highly unlikely that we will even get close to the high number, but still, the reserved CHF 65'000.00 might not be accurate any longer.

Simon: the value you had paid at the time of the purchase/receipt of crypto is supposed to be the value that has to be declared as asset to the tax authority. It seems as if MME's tax ruling and their tax assessment no longer holds true, even though it was only written beginning of 2017. I would like to meet with them and ideally our new interim CFO to get more clarity.

Zach: Simon and Codex Execution should assess what happened with MME, and we should have a meeting with MME when we are in Switzerland to understand the status quo of the tax ruling and the accuracy of the respective provisions in the books.

Everybody agrees to this action item.

**Project updates**

Kim: not much news, Ed can give us an update regarding investments into film projects.

LLC is approaching to obtain a guild membership, so in a corporate structure point of view, we have to figure out how we can structure this since the guilds want to see separate entities for guild membership film projects. Usually, SPV must be incorporated for each film projects. So it must be figured out how these SPV under the current and future structure since they must have a connection to a guild and its respective guidances.

**Rentalist**

Carl: the license request is sitting with the SEC, so far, no respective RegA+ project has been approved by the SEC in that regard. It is not necessarily that they will be approved in the respective order that they have been submitted, but we currently cannot assess the timing and the validity of such an application.

---

Zach: so to summarize, I still believe and strongly suggest that Kim shall be elected to the board and be in the position of a board member

Joe: I am absolutely for adding Kim to the board when the time is ready, at the moment I would rather have her granted access to all the information without this election at this current moment.

Kim: can maybe Matt Corva represent you and speak more regularly with Simon, Patrik and the team to have you updated and informed better? How can we improve you being more involved?

Joe: sure, Matt will be included by me more so he can update me. I did my best to be more invested in calls and meetings this year.

Zach: what is your position on Kim joining the board?

Arie: it the same as Joe's.

MEETING ADJOURNED